John A. Abom, Esquire
Attorney I.D. No.: 77961
2 West High Street
Carlisle, Pennsylvania 17013
(717) 249-0900

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | : | DOCKET NO. 1:17-CR-273 |
|---|---|---|
| *Plaintiff* | : | |
| v. | : | (Judge Jones) |
| | : | |
| SEAN D. CORNICK | : | |
| *Defendant* | : | |

## DEFENDANT'S PRE-SENTENCING MEMORANDUM

**AND NOW**, comes the Defendant, Sean Cornick by and through his counsel, John A. Abom, Esquire, and submits the following Pre-Sentencing Memorandum, respectfully requesting the Honorable Court consider the information submitted herein when deciding upon an appropriate sentence.

### I.    Statement of the Case

On October 23, 2016, Sean D. Cornick, a Harrisburg City Police Corporal and Supervisor of the Organized Crime and Vice Unit, removed and took into his possession $400 from the vice unit's temporary evidence storage room. Those funds were part of $2,688 that FBI agents had placed with placebo pills two days earlier into what city officers believed was an abandoned rental car. (PSR pp. 4-9). Following his arrest on October 27, 2016, Mr. Cornick admitted he removed the funds and that he co-mingled the funds with county funds located in a safe in his office. FBI agents

located $100 of the original $400 in that safe (PSR pp. 9). Mr. Cornick admitted to agents that he used those county funds for food and other personal expenses. An audit of funds provided by Dauphin County for use in undercover vice operations revealed a shortage of $22,046.93, for which Mr. Cornick has accepted responsibility. (PSR pp. 3, 11).

By plea agreement, the parties have agreed the following Guideline calculations apply: The base offense level is six (6). A four (4) level enhancement applies for amount of loss ($22,346.93). A two (2) level increase applies for abuse of position of trust. Enhancements for obstruction of justice and weapon possession do not apply. Accordingly, Total Offense Level is ten (10), and a two (2) level downward departure will apply for acceptance of responsibility, if found to be warranted. (PSR pp. 3). Assuming this downward departure is found to be warranted, Mr. Cornick's Criminal History Category of I (zero criminal history points) results in an advisory Guideline range of 6-12 months, Zone B. (PSR pp. 29, 60).

II. **Outstanding Objection to the PSR**

 a) **Neither an Upward Departure Nor a Variance is Warranted for Significant Disruption of Governmental Function.**

At paragraph 75 and 76 of the PSR, it is suggested that an upward departure or variance may be warranted for "significant disruption of governmental function", pursuant to U.S.S.G. §5K2.7. (PSR pp. 75-6). However, Mr. Cornick and the

Government have agreed in paragraph 11(h) of the Plea Agreement that such an upward departure is not warranted and should not apply in this case. The Government and Mr. Cornick have a factual basis for such agreement as the theft of government funds ordinarily results in disruption of a governmental function and, in this case there is no further, specifically identified disruption which would be a "significant disruption" as contemplated by the Guidelines. Further, to the extent that Mr. Cornick's violation of the public trust placed in him as a Supervisor of the Vice Unit may have resulted in a later decision to resolve cases by the District Attorney's Office, this result does not make this police-involved case exceptional or extraordinary and his violation of public trust is already accounted for in the sentencing guidelines pursuant to U.S.S.G. §3B1.3.

### III. Section 3553(a) Factors

    a) **The History and Characteristics of the Defendant**

        i) <u>Early Life</u>

Sean Cornick was born and raised in a low income family in the Bronx, N.Y. Sean lived throughout his childhood in a housing project with his parents and five (5) brothers and sisters. When an aunt overdosed on drugs, Sean's family took in her four (4) children. At time of Sean's birth in 1972, his father was incarcerated, serving about five (5) years on drug charges. Young Sean was physically abused by both his parents, being struck with extension cords and Whiffle ball bats as "discipline." He

3

also witnessed his father beat his mother. (PSR pp. 30-1). Sean's later mental health diagnoses of Post-Traumatic Stress Disorder is likely related to the stress, drama and violence to which he was exposed during his youth. (Exhibit A).

ii) <u>Education</u>

Sean overcame many of the difficulties of his childhood and graduated from DeWitt Clinton High School in the Bronx in 1990. (PSR pp. 40). Sean aspired to "get out" of the Bronx and chose to follow in the footsteps of an older cousin by enlisting in the Marine Corps. He completed basic training in 1991, later completing training as a Cannon Crewman and on the subject of Terrorism Counteraction. After Honorable Discharge in 1994, Sean completed the Municipal Police Officers Basic Training Course in Reading, Pennsylvania and Deputy Sheriff's Training Course in Carlisle.

Sean is certified in CPR and First Aid, as well as the National Crime Information Center, the Pennsylvania Justice Network, and wiretapping/electronic surveillance.

iii) <u>Military Service</u>

"Our Nation has a long tradition of according leniency to veterans in recognition of their services…" <u>Porter v. McCollum</u>, 558 U.S. 30, 43, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).

After graduation, Sean enlisted in the United States Marine Corps, completing

4

basic training at Parris Island, S.C. in 1990-1991, followed by Marine Combat Training at Camp Lejeune N.C. Sean was stationed at the Marine Corps Duty Station in Okinawa Japan from July 1991-July 1992 and Camp Lejeune N.C. until his Honorable Discharge in December 1994. While stationed in Japan, he earned the rank of Lance Corporal. His career concluded with the rank of Corporal (E-4). At time of discharge, Sean was Section Chief of an artillery unit. (PSR pp. 50). More specifically, he served as a Howitzer Section Chief of a thirty-six (36) man battery unit with a world-wide contingency mission. Sean was responsible for more than $1,500,000 worth of equipment and responsible for verifying safe and accurate firing data and training personnel in cannon gunnery procedures of firing and displacement. In 1993, Sean was aboard an amphibious assault ship which was deployed across the Atlantic Ocean to the Bosnian shore during active conflict between the Balkan States. Sean remained on inactive duty until 1998.

For his service, Sean earned a National Defense Service Medal for Gulf War Era in 1991 and a Good Conduct Service Medal in 1993.

   iv)   <u>Employment History</u>

Immediately after discharge, Sean worked a security guard for St. Joseph's Hospital and the Berkshire Mall, each in Berks County Pennsylvania, from 1995-1997. (PSR pp. 46-7). In 1996, Sean put himself through the Reading Police Academy, passed pre-qualification, and became certified to become a police officer in

5

Pennsylvania.

After briefly working as a Deputy Sheriff in Berks County, Sean accepted employment as a Harrisburg Police Officer. (PSR pp. 45). In his nearly twenty (20) year career with Harrisburg Police Department from 1997-2017, Sean rose through the ranks from Patrol Officer First Platoon (night shift) (1997-1999) to Patrol Officer Specialty Housing Unit (1997-2002) to Patrol Officer Third Platoon (2003-2005). In Third Platoon, Sean was responsible for training new police officers and assisting Criminal Investigational Division Organized Crime and Vice Control. He then earned the rank of vice unit Detective in 2005, where he conducted and supervised undercover drug and firearms purchasing operations, and electronic surveillance. At times, Sean participated the officer exchange program in order to conduct undercover work for the cities of Lancaster and York. In this capacity, Sean was a recognized expert witness in the Dauphin County Court of Common Pleas and assisted with federal investigations in the Middle District.

In 2015, Sean again rose in the ranks to Corporal Supervisor. This position encompassed not only vice investigations but all major crimes such as homicides, rapes, robberies, assaults, and child abuse. Per the Chief of Harrisburg Police, Sean received no disciplinary history prior to the arrest giving rise to the case before the Court. (PSR pp. 44). In fact, throughout his career in law enforcement, Sean earned a total of thirty-three Awards and Commendations, as follows:

6

<u>1998</u> – Letters of Commendation.

<u>2000</u> – Letters of Commendation.

<u>2001</u> – City of Harrisburg Bureau of Police "Police Officer of the Year"; Harrisburg Optimist's Club "Police Officer of the Year."

<u>2002</u> – South Allison Hill Commendation; City of Harrisburg Bureau of Police Distinguished Unit Citation.

<u>2003</u> – City of Harrisburg Bureau of Police Award of Merit (twice).

<u>2005</u> – National Service and Deployment Commendation – Operation Hurricane Katrina; Letters of Commendation.

<u>2006</u> - City of Harrisburg Bureau of Police Distinguished Unit Citation; Award of Merit (three times).

<u>2007</u> - City of Harrisburg Bureau of Police Distinguished Unit Citation; Award of Merit (five time).

<u>2008</u> - City of Harrisburg Bureau of Police Award of Merit (five times).

<u>2009</u> – Letters of Commendation; City of Harrisburg Bureau of Police Award of Merit (twice).

<u>2012</u> - City of Harrisburg Bureau of Police Distinguished Unit Citation (three times); Award of Merit.

<u>2013</u> – Swatara Police Award for Merit.

In addition to his years of honorable law enforcement service and commendations,

Sean was the organizer of benefit sporting events, charity food drives, and Midnight basketball program.

    v)    <u>Sean had an exemplary record prior to the instant offense</u>

Sean has no prior record whatsoever, either as an adult or a juvenile. (PSR pp. 27-8). A lifetime of crime was certainly an available option, given both Sean's father and brother (Shaheed Jackson) have served or are serving time for drug offenses. (PSR pp. 30). It was not an option Sean chose to accept, instead dedicating himself to military and public service until the instant offense, which he committed at age forty-four (44).

    vi)    <u>Post-Arrest Conduct</u>

Since his arrest in October 2016, Sean has been extremely remorseful for his actions. He has worked a series of jobs to support himself, his wife, and their daughter. Presently, he works as a driver for the ride sharing service Uber, and a warehouse worker at Chewy's in Mechanicsburg. (PSR pp. 41). He also worked for Benefit Vision and Amazon, but lost those jobs due to the instant charges. (PSR pp. 42-3). In addition to employment to support his family, Sean used his time positively by volunteering with the Joshua Group, a resource for at-risk youth in the Harrisburg area. (See letter from Kirk Hallett, Director of the Joshua Group, Exhibit D).

    vii)    <u>Family</u>

Unlike his family growing up, Sean now has a loving family consisting of his

wife, Anne Gingrich Cornick, and their daughter six (6) year old daughter, Harlan. Anne Gingrich Cornick, a practicing attorney, married Sean in October 2010. She has authored a letter to the Court, in which she details Sean's difficult upbringing, his hard work to escape the circumstances of his birth, his mental health, and his love for their daughter. (See Letter from Anne Gingrich Cornick, 1/22/2018, attached hereto as Exhibit A).

  viii) <u>Community Involvement, Support and Character References</u>

A wealth of friends and family have written on Sean's behalf, as follows:

- Amalie Gingrich, Sean's mother-in-law, would like the Court to know Mr. Cornick has been an exemplary husband and father, who has always been generous with his time. (Exhibit B).

- A cousin of Anne's, the Reverend Rick Summy, attests to Mr. Cornick's remorse for his actions, his skill as a father and he asks the Court to be merciful and to consider Sean's past positive contributions to his community and his country when imposing his sentence. (Exhibit C).

- Kirk Hallett, the Founder and Director of the Joshua Group in Harrisburg, documents how Sean be a volunteer after-school mentor with their program and the support he was able to provide at-risk boys. (Exhibit D).

- Sean's brother, Robert Cornick, expresses that Sean is "one of the most loyal and

protective family men I know. (Exhibit E).

- Levell Jenkins has known Sean Cornick for since 1997, having met Sean because both men worked for the Harrisburg Police Department. In nearly twenty (20) years on the job together, Mr. Jenkins observed Sean move up the ranks from Patrol Officer to Detective. Since his arrest, "Sean never cast blame on anyone" and took full responsibility for his actions. (Exhibit F).

- A friend of fifteen (15) years, Terry Bowman, would like the Court to know Sean works tireless hours and is committed to making a difference. (Exhibit G).

- Tracy Watkins Harper has known Sean since 2003 and knows him to be a dependable friend, hard worker, and dedicated father. (Exhibit H).

- Paula J. McDermott is "honored" to write on Sean's behalf due to their personal and professional friendship of more than eleven (11) years. (Exhibit I).

- Angel Lopez, who met Sean in the Police Academy in 1997 and who was best man at Sean and Anne's wedding, describes Sean as a valuable member of the community. (Exhibit J).

   ix) <u>Mental Health</u>

Likely due to his difficult upbringing, Sean suffers from depression, anxiety, post-traumatic stress, and suicidal thoughts. (PSR pp. 36-7). With Anne's encouragement, Sean has received regular therapy sessions and medication since 2007.

To date, he is compliant with treatment and medication management and has discontinued use of alcohol. (PSR pp. 38).

    b) **Nature and Circumstances of the Offense**

Following his arrest, Sean promptly admitted his wrongdoing. He agreed to plead guilty and accepted responsibility for missing money which pre-dated the sting operation.

Sean's letter, which appears in the PSR, further acknowledges his misconduct and accepts responsibility for his actions. Because the handwritten, Xeroxed copy is difficult to read, it has been typed verbatim as follows:

11/14/17

Dear Mr. Vought:

I was born and raised in the Bronx, went to High School, Dewitt Clinton and at 17 years old I enlisted in the Marine Corps under the delayed entry program. I graduated High School in 1990, June and I was given a reporting date for the Marine Corps Recruit Training, December 18, 1990. I completed my contract with the United States Marine Corps of 4 years being Honorably Discharged December 1994. I got out the Marine Corps and moved to Reading PA which I wanted to pursue a career in Law Enforcement. While working full time I put myself through the Reading Police Academy Act 120 Program, May 1996 – Sept 1996. I successfully

passed and was certified to become a Police Officer in Pennsylvania. I took the Harrisburg Police Test November of 1996 and after passing all the Pre Qualification Employment, I was offered a job with the Harrisburg Bureau of Police September 15, 1997. By 2016 I rose up the rank to Corporal and I was assigned as Police Supervisor of the Vice Unit, 9 mths after being promoted and being a Uniform Patrol Officer Supervisor January of 2015. In my position, I had supervision, control and responsibility for all Dauphin Drug Funds that were kept in a safe in the Vice Unit Office.

    I was aware the funds were to be used law enforcement purposes to investigate drug trafficking. Regrettably, I began to use some of the funds for non-law enforcement purposes and I used some of the funds for personal reasons and expenses. Initially, it was my intent to repay those funds but over time I fell behind and was unable to do so. By October 2016, I did not know the full amount. I had fallen behind but I sought ways to repay and replenish the money I had taken.

    Sometime in the ending of October 2016, I was advised by a Detective in the Unit being called to investigate a vehicle with cash and drugs being in plain view and vehicle abandoned. Those items was placed in the temporary evidence locker by the Detective to which I had access to. In the early morning hours of October 23, 2016, I did enter the temporary locker where the seized items was located and I removed $500. I did place those funds in the Dauphin County Drug Task force funds which

was in the safe. A couple of days later I was arrested. I did admit to the FBI investigators about taking the funds and when they brought up the money also missing from the safe in excess of twenty thousand dollars I was confused. I told the Agents that I put the funds taken from Locker back into the safe and also I tried to replenish the safe with funds I used for personal expenses. While I do not know the exact amount of funds that I removed, I do not dispute the amount as determined through the audit that was performed following my arrest.

I am deeply sorry for my actions and recognize my conduct reflects poorly on the City of Harrisburg Bureau of Police and its hardworking and honest officers and places all Law Enforcement in a poor light. I will make every effort to promptly pay restitution and will continue to do what I can to make amends for any wrongful conduct.

Sincerely,

Sean Cornick

c) **The Types of Sentences Available to the Court**

As a Zone B offense, §5C1.1(c) of the Sentencing Guidelines recommend that the Court impose either 1) a sentence of imprisonment; 2) "a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in

subsection (e), provided that at least one month is satisfied by imprisonment" or 3) "a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e)."

§5C1.1(e), Schedule of Substitute Punishments, provides:

> **(1)    One day of intermittent confinement in prison or jail for one day of imprisonment (each 24 hours of confinement is credited as one day of intermittent confinement, provided, however, that one day shall be credited for any calendar day during which the defendant is employed in the community and confined during all remaining hours);**
>
> **(2)    One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) for one day of imprisonment;**
>
> **(3)    One day of home detention for one day of imprisonment.**

The Guidelines are, of course, advisory. By statute, the Court is at liberty to impose a total sentence of house arrest, probation, or supervised release. 18 U.S.C. 3583(b)(2); 3561(c)(1). Given the hardship Mr. Cornick as a former police officer will likely face if sentenced jail time, it is submitted that a sentence of house arrest is warranted and appropriate.

**IV.    Conclusion**

**WHEREFORE**, for the reasons set forth above, Mr. Cornick respectfully requests This Honorable Court accept the Guideline calculation provided by the Plea Agreement and consider the information contained within this Memorandum when determining sentence. As a Zone B offense, the minimum term may be satisfied by a sentence of at least one (1) month imprisonment followed by a term of Supervised Release to include community confinement or home detention.

Respectfully submitted,

**ABOM & KUTULAKIS, L.L.P.**

Date: February 9, 2018

*John A. Abom, Esquire/s/*
John A. Abom, Esquire
2 W. High Street
Carlisle, PA 17013
(717) 249-0900
Attorney I.D. # 77961
*Attorney for Defendant*

## **CERTIFICATE OF SERVICE**

I, John A. Abom, Esquire, hereby certify that on this 9th day of February, 2018, a true and correct copy of the foregoing Pre-Sentencing Memorandum was served upon the party named below via electronic means addressed as follows:

John J. Valkovci

john.valkovci@usdoj.gov


                                          *John A. Abom*   /s/
                                          John A. Abom, Esquire